[No. D005278. Fourth Dist., Div. One. Sept. 3, 1987.]

CARL MAGGIO, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party
in Interest.

1330

## COUNSEL

Gray, Cary, Ames & Frye and Merrill F. Storms, Jr., for Petitioner.

Daniel G. Stone and Nancy Bramberg for Respondent.

Dianna Lyons for Real Party in Interest.

OPINION

BUTLER, J.—Carl Maggio, doing business as Maggio Farms, seeks a writ of review of an Agricultural Labor Relations Board (ALRB or Board) decision holding the United Farm Workers of America (UFW or Union) had bargained in bad faith during the period January 1, 1982, through October 29, 1984. Maggio contends the Board erred in failing to order the Union to pay Maggio employees for losses resulting from the bad faith bargaining; failed to award Maggio an amount for costs it incurred negotiating and litigating; and Maggio also asks the court to find the ALRB erred in not basing its refusal-to-bargain finding on additional grounds.

I

Between January 1982 and October 1984 Maggio grew and harvested crops in the Imperial Valley and harvested in the Salinas Valley. From the summer of 1977 through January 1979, the UFW had a collective bargaining agreement with Maggio. Negotiations on renewal of the agreement broke off in February 1979. During the 34 months between January 1982 and October 1984, the UFW and Maggio held 16 negotiation sessions. The UFW cancelled seven and Maggio cancelled one. There were five extended periods when no meetings were held. The ALRB found: "[T]he UFW was responsible for numerous excessive delays in negotiations, including the five extended periods when no meetings took place, and that the Union intentionally failed and refused to meet with the Charging Party. Most of the delays and cancellations of meetings by the UFW appear to have been the result of the Union's being understaffed. David Martinez and Arturo Mendoza, the UFW's principal negotiators, were also assigned to other union duties, such as contract administration, organizing, other negotiations, and litigation. . . . [A] party's duty to meet at reasonable times and places cannot be mitigated by the unavailability of its representatives. (*Montebello Rose Co., Inc., et al.* (1979) 5 ALRB No. 64; see also *Insulating Fabricators, Inc.* (1963) 144 NLRB 1325 [54 LRRM 1246].) The Union's frequent, prolonged delays in bargaining indicate that it did not treat its bargaining obligation as seriously as it would other union business (*NLRB* v. *Reed & Prince Mfg. Co.* (1951) 96 NLRB 850 [28 LRRM 1608] enforced 205 F.2d 131 (C.A. 1 1953) [32 LRRM 2225]) and, by its dilatory conduct, the Union

has engaged in surface bargaining in violation of Labor Code section 1154(c)." (12 ALRB No. 16, p. 5, fn. omitted.)

Additionally, the Board found the Union had failed to bargain in good faith through failure to respond to proposals and provide counterproposals. (*Id.* at pp. 9-10.)

Finally, the Board found the UFW had engaged in bad faith bargaining through delay in providing Maggio with information requested by the company on the union's Robert F. Kennedy Medical Plan, Juan de la Cruz Pension Plan and Martin Luther King Fund (for charitable and educational contributions). The Board stated: "[T]he UFW's unreasonable four-month delay in providing benefit plan information violated section 1154(c) in that the Union's conduct impeded negotiations by undermining Maggio's attempts to negotiate knowledgeably and to prepare realistic proposals, (*Cardinal Distributing Co.* v. *ALRB* (1984) 159 Cal.App.3d 758, 768 [205 Cal.Rptr. 860].)" (12 ALRB No. 16, p. 13.)

Based on the above, the Board found the UFW had not bargained in good faith. The question then facing the Board was the appropriate remedy. The Board ordered the UFW to cease and desist from failing to bargain in good faith; failing to meet at reasonable times with Maggio; failing to respond to Maggio's proposals and submit proposals of their own; and failing to furnish requested information. The Board also ordered the Union to sign, post and mail a notice drafted by the Board in which the Union admits it bargained in bad faith. Maggio argues the Board erred in failing to also order the Union to make Maggio employees whole for losses sustained as a result of its refusal to bargain in good faith.

■ There is no authority directly in support of Maggio's contention the Board erred by not ordering the Union to make Maggio employees whole for the Union's failure to bargain in good faith. Unlike the National Labor Relations Act, California's Agricultural Labor Relations Act states a remedial order may provide "for the loss of pay from the *employer's* refusal to bargain." (Lab. Code, § 1160.3, italics added.) It does not refer to a union's refusal to bargain.

Section 1160.3 provides in pertinent part: " . . . If, upon the preponderance of the testimony taken, the board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, the board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, to take affirmative action, including reinstatement of employees with or without backpay, and making

employees whole, when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain, and to provide such other relief as will effectuate the policies of this part."

While recognizing section 1160.3 specifically refers to a makewhole only from an employer's refusal to bargain and not a union's refusal to bargain, Maggio argues the Board should have ordered the Union to make the employees whole as "such other relief as will effectuate the policies of this part." Maggio then criticizes the Board's statutory construction on this issue.

The ALRB commenced its discussion by noting that "the intent of the Legislature should be ascertained so as to effectuate the purpose of the law." (12 ARLB No. 16, p. 14.) The Board went on to say, "[t]he legislative intent may be ascertained by considering not only the words used, but also such matters as the object in view, the evils to be remedied, the legislative history, and public policy." (*Ibid.*) The Board then notes whether a union should make employees whole for refusal to bargain was not raised during the legislative hearings preceding enactment of the act. The Board quotes the testimony of then secretary of the Agricultural and Services Agency, Rose Bird, to the Senate Industrial Relations Committee regarding the issue of a makewhole remedy for an employer's refusal to bargain. Then Secretary Bird said: "Senator, this language was just placed in because there has been a good deal of discussion with the National Labor Relations Act that it ought to be amended to allow 'makewhole' remedy, and this is something that the people who have looked at this Act carefully believe is a progressive step and should be taken. And we decided since we were starting anew here in California, that we would take a progressive step. *Now what we're talking here is only where an employer bargains in bad faith.* You makewhole the employee with backpay, and that's all we're talking about." (*Id.* at p. 15, italics added.)

The ALRB noted a long-standing controversy has existed over whether the National Labor Relations Board (NLRB) can order an employer to make employees whole following a refusal to bargain by an employer. The Board pointed out in *International Union of E., R., & M. W., AFL-CIO* v. *N.L.R.B. (Tiidee)* (D.C. Cir. 1970) 426 F.2d 1243, certiorari denied 400 U.S. 950 [27 L.Ed.2d 256, 91 S.Ct. 239], the court was faced with the question of whether an employer could be required to make employees whole for damage caused by its refusal to bargain in good faith. While discussing the issue, the *Tiidee* court recognized the impact a refusal to bargain in good faith by an employer can have on a union: "Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining. When the company is finally ordered to bargain with the union some years later, the union may

find that it represents only a small fraction of the employees. *See* Ross, Analysis of Administrative Process Under Taft-Hartley, 1966 Labor Relations Yearbook 299, 302-03; Note, An Assessment of the Proposed 'Make-Whole' Remedy in Refusal-To-Bargain Cases, 67 Mich.L.Rev. 374, 378 (1968). Thus the employer may reap a second benefit from his original refusal to comply with the law: he may continue to enjoy lower labor expenses after the order to bargain either because the union is gone or because it is too weak to bargain effectively." (*Id*. at p. 1249.)

On the other hand, failure of a union to obtain a contract provides the union with no benefit. The UFW, like most unions, exists through members' dues. With no contracts, there will be no members. In light of this problem, as the ALRB noted: "The language of Labor Code section 1160.3, as well as the ALRA's legislative history, indicate that the makewhole remedy was intended to be imposed only against employers. Ordinarily, there are sufficient incentives for a union to reach a collective bargaining agreement that do not exist for an employer." (12 ALRB No. 16, pp. 17-18.)

The words of section 1160.3 support the Board's conclusion. The section specifically says the ALRB may order employees made whole "for loss of pay resulting from the *employer's* refusal to bargain, . . . and to provide such other relief as will effectuate the policies of the Act." (Italics added.) The Board recognized if, as Maggio argues, the "other relief" clause enables it to order makewhole for bad faith bargaining, the language directed specifically at employers' bad faith is mere surplusage.

Additionally, the Board noted the statutory construction principle *expressio unius est exclusio alterius* applies here. The Board concludes through inclusion of the word "employer" while omitting the word "union" in section 1160.3, the Legislature intended to impose a makewhole remedy on employers for refusal to bargain but not on unions. As the Board points out: "This interpretation is even more compelling in light of the section's later language specifying that when a Board Order directs reinstatement of an employee, 'backpay may be required of the employer *or labor organization, as the case may be*, responsible for the discrimination suffered by him.' (Emphasis added.) If the Legislature had intended the makewhole remedy to be available against unions, then it would logically have listed unions in the makewhole portion of the statute as it did in the backpay portion." (12 ALRB No. 16, p. 19.)

The ALRB is the body the Legislature chose to initially interpret the Agricultural Labor Relations Act. An interpretation by the Board, " 'drawing upon its familiarity with the history of the ALRA and the "general understanding of the times" must be given great weight.' " (*Harry Carian*

*Sales* v. *Agricultural Labor Relations Bd.* (1985) 39 Cal.3d 209, 224 [216 Cal.Rptr. 688, 703 P.2d 27], quoting *Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 859 [176 Cal.Rptr. 753, 633 P.2d 949].) It was the legislative intent the ALRB "serve as 'one of those agencies presumably equipped or informed by experience to deal with a specialized field of . . . expertness which courts do not possess and therefore must respect.'" (*Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 346 [156 Cal.Rptr. 1, 595 P.2d 579], quoting *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 488 [95 L.Ed. 456, 467, 71 S.Ct. 456].)

■ Maggio also argues the ALRB erred in failing to order the UFW pay its attorney fees and negotiating costs. At the outset of its argument, Maggio agrees with the NLRB policy not to "award costs unless a party has repeatedly violated its statutory obligations, engaged in misconduct showing flagrant disregard for employee rights, or engaged in frivolous litigation." Maggio argues, in essence, the Board finding the UFW did not act in this manner is not supported by substantial evidence. The Board had found: "[N]either the UFW's conduct during negotiations nor its conduct in defense of this case warrants the imposition of the extraordinary relief of attorneys' fees or costs. There is no evidence herein that Respondent has repeatedly violated its statutory obligations or engaged in misconduct showing flagrant disregard for employee rights. (*Autoprod, Inc.* (1982) 265 NLRB 311 [111 LRRM 1521].) Neither is there evidence that in defending itself herein, the UFW has engaged in frivolous litigation. (*International Union of Electrical Radio and Machine Workers, AFL-CIO (IUE)* [*Tiidee Products, Inc.*] v. *NLRB, supra,* 194 NLRB 1234; *Robert H. Hickam* (1978) 4 ALRB No. 73.) Although the Union was unable to establish that the Charging Party engaged in bad faith bargaining or that Respondent itself was bargaining in good faith, the factual findings and conclusions of law were not so readily apparent, without litigation, that a reasonable party would not have proceeded to hearing." (12 ALRB No. 16, pp. 20-21.)

The record contains no evidence of a history by the UFW of violation of the act, such as existed in *J.P. Stevens & Co. Inc.* (1979) 244 NLRB No. 82 [102 LRRM 1039], one of the few NLRB cases in which the prevailing party was awarded costs and attorney fees. In *Stevens,* the company had attempted to destroy the union through persistent violations of the NLRA, NLRB orders, court decrees and contempt citations. Furthermore, the employer persisted in its unrelenting efforts to exhaust the union's resources. The NLRB wrote: "[F]ew, if any, who are subject to regulation under this Act, have achieved the excesses of J.P. Stevens. . . . Though some 15 years have passed since the Union's first organizational drive, J.P. Stevens has yet to alter its dedication to outright rejection of this Statute and to frustration

of the administrative and judicial remedies contemplated thereby. . . . The predicate for such relief is not limited to the seriousness and sustained nature of the violations found herein, but also finds support in Stevens' policy of intransigence whereby court enforced orders of the Board have been flouted and contempt decrees reduced to mockery." (*Id.* at p. 1040.)

At most, here, the UFW erred in seeking too great benefits for its members, in light of the economic strength of the Union and financial condition of Maggio. This is not a case of "repeated violations of a statutory obligation," "misconduct showing flagrant disregard for employee rights," or "frivolous litigation."

■ Finally, Maggio contends the ALRB erred in failing to base its finding the UFW refused to bargain in good faith on additional grounds. Maggio argues in addition to surface bargaining, as found by the Board, the Union maintained an unchanging posture through the period in question and submitted regressive and predictably unacceptable proposals during the negotiations.

Maggio's contention regarding predictably unacceptable offers by the Union is based upon the Union consistently demanding the economic package obtained by the workers in the Sun Harvest contract, or greater benefits than Sun Harvest. The Board refused to accept this contention, finding the union was "anxious to reestablish with Maggio the same wage and benefit rates as those being paid in the Salinas Valley, a uniformity that had existed in the 1977-1979 Maggio-UFW contract. Since Maggio had previously agreed to the same rates as were being paid in the Salinas Valley . . . the instant negotiations cannot be categorized as unreasonable." (12 ALRB No. 16 at p. 10.)

Citing 1 Morris, The Developing Labor Law (2d ed.) page 587, the Board noted in any case "a predictably unacceptable proposal does not justify an inference of bad faith unless it acts to foreclose future negotiations or is so patently unreasonable as to frustrate the reaching of an agreement." (12 ALRB No. 16 at p. 11.) The Board found that maintaining the Sun Harvest economic proposal was reasonable and the wager offer exceeding the Sun Harvest rate was mere posturing. Factual findings of the Board, as the finder of fact, must be sustained if supported by substantial evidence. Here, this issue came down to whether the Union negotiator was to be believed. In making a credibility determination on this issue, this court will not interfere with the Board. (See *Abatti Farms, Inc.* v. *Agricultural Labor Relations Bd* . (1980) 107 Cal.App.3d 317, 334 [165 Cal.Rptr. 887] (conc. opn. of Staniforth, J.).)

For the reasons set out, the petition for a writ of review is summarily denied.

Work, Acting P. J., and Todd, J., concurred.