Filed 2/5/16  Hughes v. Cal. State Personnel Bd. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CHARLES HUGHES, <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> CALIFORNIA STATE PERSONNEL BOARD et al., <br><br>     Defendants and Respondents. | B255921 <br><br> (Los Angeles County <br> Super. Ct. No. BS137236) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, James C. Chalfant, Judge.  Affirmed.

Law Offices of Stephen J. Horvath, Stephen J. Horvath, Marcus J. Berger; Benedon & Serlin, Douglas G. Benedon, and Gerald M. Serlin for Plaintiff and Appellant.

Department of Corrections and Rehabilitation, Office of Legal Affairs, Clayton A. Mack, Supervising Attorney, for Real Party in Interest.

# INTRODUCTION

Petitioner and appellant Charles Hughes (petitioner) petitioned the trial court for an administrative writ of mandate to set aside the decision of respondent State Personnel Board (Board) upholding a 10-day suspension for misconduct imposed by petitioner's employer, real party in interest Department of Corrections and Rehabilitation (Department). On appeal from the trial court's judgment denying his petition, petitioner contends that the trial court erred when it concluded that the Board did not have jurisdiction to determine certain of his affirmative defenses to two of the allegations of misconduct asserted by the Department. Petitioner further contends that the trial court erred when it found that substantial evidence supported the Board's findings that petitioner had adequate notice that his alleged misconduct would subject him to discipline, had threatened to have a captain fired, and had disrupted the workplace. Petitioner also argues that his 10-day suspension was excessive and should have been reduced by the trial court.

We hold that the Board did not have jurisdiction to determine petitioner's defenses to the two allegations of misconduct in issue to the extent those defenses were based on alleged violations of rights conferred on union members under the Dills Act.[1] We further hold that substantial evidence supported the Board's findings that petitioner had adequate notice that his alleged misconduct could subject him to discipline, had threatened to have a captain fired, and had disrupted the workplace. We also hold that the Board did not abuse its discretion by finding that petitioner's 10-day suspension was an appropriate

---

[1] "[I]n 1977, the Legislature enacted the State Employer-Employee Relations Act (Gov. Code, §§ 3512-3524) to govern relations between the state government and certain of its employees. [Citation.] It was later renamed, and its official name is now the Ralph C. Dills Act (hereafter the Dills Act). [Citation.]" (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1085.)

punishment.  We therefore affirm the judgment denying the petition for a peremptory writ of mandate.

## FACTUAL BACKGROUND

### A.      Board's Findings of Fact

Petitioner concedes that, with three limited exceptions, his "appeal arises almost entirely from undisputed facts."  According to petitioner, the only factual findings of the Board as to which he challenges the sufficiency of the evidence are the issues of:  (i) whether he had actual or constructive notice that his language and behavior could subject him to discipline; (ii) whether certain statements constituted an implied threat to have a captain fired; and (iii) whether his conduct in the records department caused disruption in the workplace.  Therefore, the factual background is based upon the Board's findings of fact and its determinations regarding petitioner's credibility.  The evidence relevant to the three factual disputes is discussed below.

#### 1.      *Threat to Captain Wofford*

Sometime in 2003, petitioner, a correctional lieutenant, had a dispute with a captain over a union-related matter.  The captain threatened to kick petitioner's "ass," and petitioner responded, "Fuck you, mother fuck—fuck you, you punk ass mother fucker."  Both petitioner and the captain received letters of reprimand.  Petitioner defended the case by arguing that his conduct, including his speech, was considered union activity and thus protected under the Dills Act.  Following the Department's review of petitioner's defense, the adverse action against petitioner was revoked based on the Department's conclusion that petitioner had engaged in protected activity at the time of the incident.  Petitioner was informed of the decision and the underlying reason for the decision.

Petitioner was familiar with Title 15 of California Code of Regulations, section 3391, subsection (a), which petitioner understood to require professional behavior while on duty.  Petitioner also understood that section 3391 prohibited the use of profanity

3

while on duty and required employees to avoid irresponsible or unethical conduct or conduct reflecting discredit on oneself or the Department, either on or off duty.

During the relevant time periods at issue, the use of profanity at California State Prison-Los Angeles County (the prison) whether by management, correctional officers who were on duty, or correctional officers acting in their capacity as union representatives, was normal. Such phrases as "fuck you" "kiss my ass," "you're an asshole," and "you want to fuck or do you want to dance or do you want to fight" were not uncommon. Petitioner, whether on duty or off duty, routinely used profanity, especially in meetings and discussions with management concerning union-related matters. Petitioner commonly said "later fucker" to other people, including Warden Harrison. Petitioner admitted at the hearing that he used profanity as "power words."

On June 16, 2004, petitioner was absent from work at the prison because it was his regular day off. On June 17, 2004, petitioner performed official business for the union. On June 16 or 17, 2004, Captain Wofford passed petitioner in the hallway of the prison's administrative building and walked into the records department. Petitioner followed Captain Wofford inside the department. There, petitioner confronted Captain Wofford and, in a loud, boisterous tone, stated that he had caused wardens and associate wardens to be fired, and Captain Wofford was just a captain and who "ain't shit." Petitioner followed behind as Captain Wofford walked. Petitioner was yelling, cursing, and getting louder. Captain Wofford did not respond, but kept walking. Petitioner, however, kept "going on and on." Approximately 45 employees worked in the records department, and at least two staff members observed petitioner's conduct and overheard his statements to Captain Wofford.

### 2. *Voicemail to Warden Harrison*

Prior to December 14, 2004, Warden Harrison did not formally or informally counsel or warn petitioner concerning his use of profanity. On December 14, 2004, at approximately 9:00 p.m., when petitioner was off duty, petitioner telephoned Warden Harrison and left the following voicemail message: "Okay, boss, I guess you don't want

4

to give me a call back, that's fine. I'll just let you know. I guess our relationship is in the fucking toilet, and if that is what we gotta do, that is what we fucking gotta do. Oh by the way, Bob wants to know where the fuck his tape is. Let you know I cancelled OB for all my guys. You guys got fuckin responsibility of running the post and bid.[2] If that shit is not ran in the morning, no problem. I'll probably fucking call Sacramento anyway, and I am sure you can explain it to your boss why we were running it in the fucking first place. Anyway, so, uh, hey, good luck, later fucker."

On December 15, 2004, Warden Harrison issued a memorandum stating that effective immediately, prison employees were required to follow guidelines that restricted bringing cellular telephones and pagers into certain areas of the institution, including within the secure perimeter. Warden Harrison had the discretionary authority to issue the directive. Warden Harrison's restriction on cell phones and pagers made petitioner very upset because he used his cell phone for union activities. Petitioner also thought that Warden Harrison's decision was "childish." In response to Warden Harrison's directive, petitioner prepared and distributed a memorandum to correctional officers at the prison entitled "Dad gets mad at profanity." Petitioner denied that any part of his voicemail message to Warden Harrison was discourteous.

### B.     Board's Determinations Re Petitioner's Credibility

The Board made the following credibility determinations concerning petitioner's testimony. "[Petitioner] testified in a clear and factual manner regarding his employment history, experience as a [California Correctional Peace Officers Association] representative, and his frequent use of profanity. However, the record also established that petitioner harbored animosity and bias against [Captain] Wofford . . . and [Warden] Harrison which reflected negatively upon his recollection and perception of past events.

---

[2]     "Post and bid" refers to a negotiated process in which correctional officers choose positions that they would like to work based upon their seniority. The state negotiates with the California Correctional Peace Officers Association to determine which positions are "biddable" and which will be managed by the state.

In addition, the character of [petitioner's] testimony was self-serving and tended to minimize the serious nature of his actions and speech. Additionally, [petitioner's] demeanor while testifying at hearing was at times, particularly during cross-examination, sarcastic and evasive. On the whole, [petitioner's] testimony lacked sufficient indicia of trustworthiness to be considered reliable."

## PROCEDURAL BACKGROUND

On June 19, 2005, petitioner received a notice of adverse action issued by the Department advising him that he had been suspended for 24 days due to six charges of misconduct. The Department alleged, inter alia, the following two incidents of misconduct upon which the Board based its decision upholding petitioner's 10-day suspension: On or about June 16 or 17, 2004, petitioner approached Captain Wofford and in a verbally abusive and loud manner stated that, "this is my world, I run this prison, you ain't nobody, you ain't shit, I've gotten Wardens fired and you are just a captain." Petitioner's threatening conduct was viewed and heard by Department employees Angela Taylor and Laquita Shotzman-Baker, and caused an upset in the workplace. Petitioner's statement implied a threat that he would conspire to have Captain Wofford discharged from his position with the Department.

On or about December 14, 2004, petitioner telephoned prison Warden Harrison and stated, "OK boss, I guess you don't want to give me a call back, that's fine. I just let you know, I guess our relationship is in the fucking toilet, and if that is what we gotta do, that is what we fucking gotta do. Oh by the way, Bob wants to know where the fuck his tape is. Let you know I cancelled OB for all my guys. You guys got fuckin responsibility of running the post and bid. If that shit is not ran in the morning, no problem. I'll probably fucking call Sacramento anyway, and I am sure you can explain it to your boss why we were running it in the fucking first place. Anyway, so, uh, hey, good luck, later fucker." Petitioner's message to Warden Harrison captured the complete and utter disregard of authority and lack of respect he showed supervisors and staff at the

6

prison on a consistent basis. Petitioner's statements and conduct disrupted the workplace and created an environment of fear of reprisal.

Following a *Skelly* hearing,[3] the Department reduced petitioner's suspension to 10 days. The Department issued a modified notice of adverse action on October 20, 2005.

Petitioner appealed his suspension to the Board. Following six days of evidentiary hearings, the Board issued on November 15, 2011, its decision sustaining two of the six misconduct charges—the two described above—in the Board's findings, and upholding the 10-day suspension.

As to the June 16 or 17, 2004, incident with Captain Wofford in the records department, the Board's decision sustaining the charge of misconduct found that, "Here, unlike in [*Errol L. Dunnigan v. State Personnel Board* [SPB No. 93-92] (1993) case number 28973, [petitioner] was not charged with violating a specific policy or duty of [the Department], but rather, [petitioner] was charged under Government Code section 19572, subdivision (m), treating other employees discourteously, and under Government Code section 19572, subdivision (t), failing to engage in good behavior on and/or off duty. Subdivisions (m) and (t) are causes for disciplinary action that are well established in statutory law and clearly defined by [Board] precedent that predates any of the alleged incidents at issue here. Therefore, subdivisions (m) and (t) place state employees, including [petitioner], on actual and/or constructive notice of expected standards of conduct relative to treatment of other employees and the public. Accordingly, the three-prong analysis of *Dunnigan* is inapplicable to this case. [¶] Further, [petitioner's] actions in the Records Department, as discussed above, did not simply involve the use of profanity: [petitioner's] conduct rose to the level of being threatening, hostile, and offensive. Hence, [petitioner's] misconduct fell within the *Dunnigan* exception of being

---

[3]     "*Skelly* hearing" refers to the administrative hearing required by *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194 [state statutory scheme regulating civil service employment recognizes that a permanent civil service employee has a property interest in continued employment that is protected by due process].

so clearly wrong that specific reference to a rule was not necessary. In any event, [petitioner] was familiar with title 15, California Code of Regulations, section 3391, subsection (a), which [petitioner] understood as requiring employees to avoid irresponsible or unethical conduct or conduct reflecting discredit on oneself or [the Department], either on or off duty. [¶] The evidence thus sufficiently established that [petitioner] was discourteous and engaged in other failure of good behavior on or about June 16, 2004. Therefore, the causes of action under Government Code section 19572, subdivision (m) and (t) are sustained."

As to the December 14, 2004, voice mail message to Warden Harrison, the Board's decision sustaining the charge of misconduct based on that incident found, "It was undisputed that [petitioner] left the December 14, 2004 voice mail message for [Warden] Harrison. It was also undisputed that [petitioner] was not on duty at the time he left the message. [¶] Nonetheless, [petitioner's] use of profanity and saying 'good luck, fucker' reflected negatively upon [petitioner's] position as a peace officer and a Correctional Lieutenant, and upon [the Department]. [Petitioner's] message was flippant, rude, and demeaning. Such conduct harms the public service by undermining and mocking the authority and position of the Warden, and impairs and disrupts good and productive working relationships. Thus, [petitioner's] misconduct was both discourteous under Government Code section 19572, subdivision (m) and inappropriate under subdivision (t)."

On May 3, 2012, petitioner filed a petition for peremptory writ of mandate under Code of Civil Procedure section 1085 and 1094.5. On February 20, 2014, the trial court held a hearing on the petition and, following argument, ruled that its written tentative ruling was adopted as the final ruling of the court. On March 10, 2014, the trial court entered a judgment based on its final ruling on the petition denying it. Petitioner filed a timely notice of appeal from the judgment.

8

A.       Standard of Review

Code of Civil Procedure section 1094.5 is the administrative mandamus provision that sets forth the procedure for judicial review of adjudicatory decisions rendered by administrative agencies.  "Section 1094.5 clearly contemplates that at minimum, the reviewing court must determine both whether substantial evidence supports the administrative agency's findings and whether the findings support the agency's decision. Subdivision (b) of section 1094.5 prescribes that when petitioned for a writ of mandamus, a court's inquiry should extend, among other issues, to whether 'there was any prejudicial abuse of discretion.'  Subdivision (b) then defines 'abuse of discretion' to include instances in which the administrative order or decision 'is not supported by the findings, *or* the findings are not supported by the evidence.'  (Italics added)  Subdivision (c) declares that '*in all . . . cases*' (italics added) other than those in which the reviewing court is authorized by law to judge the evidence independently, (fn. omitted) 'abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record.'  [Citation.]"  (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514-515.)

"Because the [Board] derives its adjudicatory authority from the state Constitution rather than from a legislative enactment, a superior court considering a petition for administrative mandate must defer to the [Board's] factual findings if they are supported by substantial evidence."  (*State Personnel Bd. v. Department of Personnel Admin.* (2005) 37 Cal.4th 512, 522.)  "'Since the [Board] is a constitutional agency for all its adjudicatory activities (Cal. Const., art. XXIV; [Citation], its decision, which is the subject of this [appellate] review, may be set aside only if it is found to be unsupported by any substantial evidence.  All reasonable inferences must be drawn in support of the findings of the Board.  [Citations.]  The findings and determination of the Board come before the reviewing court with a strong presumption as to their correctness and regularity.  (*Faulkner v. Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 330-331 [253

9

P.2d 659]; [Citation.])  The court may not take into account whatever evidence detracts from the weight of other evidence.  [Citation.]  [¶]  "The court may not substitute a decision contrary to that made by the department, even though such decision is equally or more reasonable, if the determination by the department is one which could have been made by reasonable people. . . ."  [Citation.]'  [¶]  'Inferences based upon circumstantial evidence are sufficient to support a finding.  [Citation.]'  [¶]  Factual determinations are not subject to re-examination in a *trial de novo*, but are to be upheld by a reviewing court if they are supported by substantial evidence.  [Citation.]  The review is to be limited to considerations of whether the board exceeded its jurisdiction, committed errors or law, abused its discretion, or made findings unsupported by substantial evidence.  *Covert v. State Board of Equalization* (1946) 29 Cal.2d 125 [173 P.2d 545]; *Merrill v. Department of Motor Vehicles* (1969) 71 Cal.2d 907 [80 Cal.Rptr. 89, 458 P.2d 33]."  (*Long v. State Personnel Bd.* (1974) 41 Cal.App.3d 1000, 1008-1009.)

"'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, "we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value . . . ."  [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]  [¶]  . . .  "[I]f the circumstances reasonably justify the [trier of fact's] findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding."  [Citation.]  We do not reweigh evidence or reevaluate a witness's credibility.  [Citation.]'  [Citations.]"  (*People v. Scott* (2012) 52 Cal.4th 452, 487.)

## B.    Jurisdiction Over Dills Act Defenses

Petitioner contends that the Board erred when it concluded that his defenses under the Dills Act were within the exclusive jurisdiction of the Public Employment Relations Board.  According to petitioner, the Department should not be permitted to circumvent the protections of the Dills Act by treating an unfair labor practice under that act as an

10

adverse personnel action subject to the jurisdiction of the Board.  Petitioner maintains that there is an overlap between the jurisdiction of the Board, on the one hand, and the Public Employment Relations Board, on the other, when allegations of employee misconduct subject to the Board's jurisdiction are predicated in whole or in part on union activity.

The Dills Act guarantees the collective bargaining rights of employees by, inter alia, making it unlawful for the state to impose reprisals on or discriminate against an employee for exercising his or her rights under the Act.  (Gov. Code, § 3519, subd. (a).)[4] "Enacted in 1977, the Dills Act (formerly known as the State Employer-Employee Relations Act or SEERA) 'accords collective bargaining rights to state civil service employees.'  (*Regents of University of California v. Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 605, fn. 3 [224 Cal.Rptr. 631, 715 P.2d 590]; see *White v. Davis* (2003) 30 Cal.4th 528, 572 [133 Cal.Rptr.2d 648, 68 P.3d 74]; *Department of Personnel Administration v. Superior Court* (1992) 5 Cal.App.4th 155, 175 [6 Cal.Rptr.2d 714].) 'Under the Dills Act, the parties may negotiate over "wages, hours, and other terms and conditions of employment," except the "merits, necessity, or organization of any service or activity provided by law or executive order" . . . .  (§§ 3516, 3517.6.)'  [Citation.]  [¶] The Dills Act also 'vests broad jurisdiction in [the Public Employment Relations Board] to investigate and act upon unfair labor charges and alleged violations of the act.' [Citation.]  To this end, subdivision (a) of section 3514.5 provides that '[a]ny employee, employee organization, or employer shall have the right to file an unfair practice charge' with the [Public Employment Relations] Board, and subdivision (c) of that statute provides that the Board 'shall have the power to issue a decision and order directing an

---

**4**    Government Code section 3519, subdivision (a) provides:  "It shall be unlawful for the state to do any of the following:  (a)  Impose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this chapter.  For purposes of this subdivision, 'employee' includes an applicant for employment or reemployment."

11

offending party to cease and desist from the unfair practice and to take such affirmative action, including but not limited to the reinstatement of employees with or without back pay, as will effectuate the policies of this chapter.' More importantly, section 3514.5 provides that '[*t*]*he initial determination as to whether the charges of unfair practices are justified, and, if so, what remedy is necessary to effectuate the purposes of this chapter, shall be a matter within the exclusive jurisdiction of the* [*Public Employment Relations Board*].' Any party 'aggrieved by a final decision or order of the [Public Employment Relations Board] in an unfair practice case, except a decision of the [Public Employment Relations Board] not to issue a complaint in such a case' can obtain judicial review of the [Public Employment Relations] Board's decision by filing a petition for writ relief. (§ 3520, subd. (b).) [¶] 'The assignment of exclusive initial jurisdiction in section 3514.5 to the [Public Employment Relations] Board means that the only forum to pursue a cause of action for violation of the statutory rights conferred in the Dills Act is before the Board.' [Citation.]" (*California Assn. of Professional Scientists v. Schwarzenegger* (2006) 137 Cal.App.4th 371, 380-381, italics added.)

Although couched as affirmative defenses to the two misconduct allegations in issue, petitioner's claims based on the Dills Act asserted that the Department, by punishing petitioner for conduct he engaged in during what he contends was protected union activity, committed an unfair labor practice prohibited by the Dills Act under Government Code section 3519, subdivision (a). The determination of whether an employer's action constitutes an unfair labor practice under the Dills Act, however, is within the exclusive jurisdiction of the Public Employment Relations Board, not the Board. (Gov. Code, § 3514.5, subd. (a).) As the court in *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168 observed: " [The Public Employment Relations Board] has been given a somewhat more specialized and more focused task: to protect both employees and the state employer from violations of the organizational and collective bargaining rights guaranteed by [the Dills Act]. Although disciplinary actions taken in violation of [the Dills Act] would transgress the merit principle as well, the Legislature evidently thought it important to assign the task of investigating potential violations of

12

[the Dills Act] to an agency which possesses and can further develop specialized expertise in the labor relations field. (Cf., e.g., *Tex-Cal Land Management, Inc. v. Agricultural Labor Relations Bd*. (1979) 24 Cal.3d 335, 346 [156 Cal.Rptr. 1, 595 P.2d 579]; *San Diego Teachers Assn. v. Superior Court* (1979) 24 Cal.3d 1, 11, 13-14 [154 Cal.Rptr. 893, 593 P.2d 838]; *Garner v. Teamsters Union* (1953) 346 U.S. 485, 490 [98 L.Ed. 228, 239, 74 S.Ct. 161].)" (*Id*. at p. 198.)

The foregoing authorities make clear that claims by an employee based on alleged violations of the Dills Act must be adjudicated by the Public Employment Relations Board. Therefore, the Board correctly concluded that it lacked jurisdiction to adjudicate petitioner's claims that the Department's adverse employment action against him violated rights protected under the Dills Act.

## C. Substantial Evidence Supported Disputed Findings

In determining whether there is substantial evidence to support the Board's findings, we look only to the evidence to support those findings. We do not determine whether the Board's decision is the one we would reach.

### 1. Notice That Language and Behavior Could be Disciplined

Petitioner contends that he was entitled to prior notice that the language and behavior that formed the basis of the two misconduct charges against him could subject him to disciplinary action by the Department. According to petitioner, the use of profanity during union activity was commonplace within the Department and that practice gave rise to his reasonable belief that the rules prohibiting the use of such profanity would not be enforced, unless the Department gave him prior notice to the contrary.[5] Petitioner relies on the Board's decisions in *Errol L. Dunnigan* (1993) SPB

---

[5] Petitioner relies, in part, on Department Operations Manual, Article 22, section 33030.3 which provides: "The rules, standards, and instructions shall be enforced uniformly without discrimination. If enforcement has been lax, management shall not suddenly change direction and crack down without first warning employees of its intent."

13

case number 28973, No. 93-32 [because California Highway Patrol did not have express policy against officers scheduling court appearances to obtain overtime compensation, officer did not have notice that such practice was prohibited] and *Ruth M. Houseman* (1993) SPB case number 30547, No. 93-33 [employee did not have notice that private sales of Avon products at work, during nonwork hours, were prohibited]. Petitioner also relies on a prior disciplinary action against him based on his use of similar profanity during union negotiations with management that was dismissed because he was acting in his union capacity.

The Department charged petitioner in the notice of adverse action under Government Code section 19572, subdivisions (m)—discourtesy—and (t)—failure of good behavior.[6] The notice also alleged that defendant violated 15 CCR section 3391(a) which provides: "Employees shall be alert, courteous, and professional in their dealings with inmates, parolees, fellow employees, visitors and members of the public. Inmates and parolees shall be addressed by their proper names, and never by derogatory or slang reference. Prison numbers shall be used only with names to summon inmates via public address systems. Employees shall not use indecent, abusive, profane, or otherwise improper language while on duty. Irresponsible or unethical conduct or conduct reflecting discredit on themselves or the department, either on or off duty, shall be avoided by all employees."

Given the statutes and regulations under which petitioner was charged, his focus on the common use of profanity at the prison misses the point of the Board's findings and its ruling based thereon. Although the Board found that use of profanity by management and officers at the prison was "normal," it emphasized that petitioner was not charged with merely using profane language; he was charged with treating other employees

---

[6] Subdivisions (m) and (t) of Government Code section 19572 provide: "Each of the following constitutes cause for discipline of an employee, or of a person whose name appears on any employment list: [¶] . . . [¶] (m) Discourteous treatment of the public or other employees. [¶] . . . [¶] (t) Other failure of good behavior either during or outside of duty hours, which is of such a nature that it causes discredit to the appointing authority or the person's employment."

14

discourteously under Government Code section 19572, subdivision (m) and with failing to engage in good behavior under subdivision (t). The Board concluded that those causes for disciplinary action are well established in statutory law. It also found that petitioner was familiar with 15 CCR section 3391, subsection (a). Therefore, the Board concluded that petitioner had sufficient actual or constructive notice that what it found to be his discourtesy and threat to Captain Wofford[7] and what it found to be his discourteous and demeaning message to Warden Harrison were grounds for disciplinary action.

Based on our review of the record, we conclude that substantial evidence supported the Board's conclusion that petitioner either knew or should have known that his language and conduct during the two incidents in question could subject him to discipline. There is evidence the profanity-laced language he used to address management personnel in the workplace was so threatening and demeaning that a reasonable correctional officer in petitioner's position would have known that it violated the well established statutory and regulatory prohibitions against such misconduct. Moreover, the Board found that petitioner's testimony was unreliable, including his testimony that, because of the Department's reversal of his reprimand for the 2003 incident and the Department's lax enforcement of its profanity prohibition, he believed his language and conduct would not be disciplined. Thus, there was substantial evidence for us to conclude the trial court did not err by upholding the Board's decision on the notice issue.

### 2. *Threat to Captain Wofford*

Petitioner's contention that there was insufficient evidence that his statements to Captain Wofford constituted a threat is contrary to the evidentiary record. There was substantial evidence that petitioner expressly advised the captain that petitioner, a

---

[7] Petitioner contends that the incident in the records department with Captain Wofford for which he was disciplined was an outgrowth of a heated, union-related exchange between petitioner and Captain Wofford approximately a week earlier. On the day of the incident, however, there was no evidence of any union-related discussions between the two men prior to petitioner's unprovoked outburst in the records department.

lieutenant, had caused wardens and associate wardens to be fired. Petitioner then reminded the captain that he was "just a captain." Taken together those statements supported a reasonable inference that petitioner was threatening to have the captain fired. Thus, the Board's finding on this issue was sufficiently supported by the evidence.

Petitioner spends several pages of his opening brief arguing that the Board and the trial court construed petitioner's comments out of context and that more weight should have been accorded other evidence, such as the details of the June 10, 2004, meeting between petitioner, another correctional officer, and Captain Wofford. But, under the controlling standard of review, we cannot reweigh the evidence or substitute our view of the evidence for that of the Board's. Instead, we must draw every reasonable inference in favor of the Board's decision, even if there is conflicting evidence. Under that standard, petitioner's comments to Captain Wofford in the records department could be fairly construed by a reasonable trier of fact as a threat to have the captain fired, and not mere bluster or hyperbole as contended by petitioner.

### 3. *Disruption*

As to petitioner's assertion that the evidence was insufficient to support a finding that his conduct in the records department was disruptive, there was sufficient evidence in the record to support such a finding. Petitioner's comments to Captain Wofford in the records department were "loud and boisterous." There were approximately 45 employees working in that department and one of those employees, Angela Taylor—whose testimony the Board found credible—testified that petitioner, using "curse words," told Captain Wofford, who was not saying anything, that petitioner had "taken many wardens down." According to Taylor, as petitioner became louder, she realized he was serious and upset, not merely joking around. Taylor thought petitioner's behavior was "inappropriate" and she discussed it with a fellow employee in the department at the time the incident occurred.

As noted, the Board found Taylor credible and unbiased. Her testimony corroborating Captain Wofford's version of the incident therefore was sufficient to

support a reasonable inference that petitioner's language and conduct in the records department were disruptive.

### D. Penalty

Petitioner contends that the 10-day suspension upheld by the Board was excessive. According to petitioner, the majority of the charges against him were not sustained, there was no evidence that his conduct inflicted harm to the public service or that his conduct was likely to recur, and he had no prior or subsequent disciplinary sanctions against him.

"In reviewing the severity of the discipline imposed, we look to the correctness of the agency's decision rather than that of the trial court. We review the actions of the [agency] to determine whether the discipline imposed constituted a manifest abuse of discretion. [Citations.] 'The penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated. (*Skelly v. State Personnel Bd.*[, *supra,*] 15 Cal.3d [at p. 194,] 217; *Magit v. Board of Medical Examiners* (1961) 57 Cal.2d 74, 87 [17 Cal.Rptr. 488, 366 P.2d 816].) Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed. (*Nightingale v. State Personnel Board* (1972) 7 Cal.3d 507, 515 [102 Cal.Rptr. 758, 498 P.2d 1006].)' (*Barber v. State Personnel Bd. (*1976) 18 Cal.3d 395, 404 [134 Cal.Rptr. 206, 556 P.2d 306].) [¶] 'In reviewing the exercise of this discretion we bear in mind the principle "courts should let administrative boards and officers work out their problems with as little judicial interference as possible. . . . Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere." (*Maxwell v. Civil Service Commisson* (1915) 169 Cal. 336 [146 P. 869]; accord *Skelly v. State Personnel Bd.*[, *supra,*] 15 Cal.3d 194, 217 . . . .)' [Citation.]" (*Landau v. Superior Court* (1998) 81 Cal.App.4th 191, 218.)

Under the applicable standard of review, we cannot substitute our judgment for that of the Board's when reviewing the degree of punishment imposed on petitioner. The Board determined that petitioner "tended to minimize the serious nature of his actions

and speech." The Board also concluded that petitioner did not believe his voicemail message to the warden was discourteous. Those findings supported a reasonable inference that petitioner's misconduct could recur. In addition, evidence of petitioner's display of hostility in the records department in front of other employees supported a reasonable inference of harm to the public service. Accordingly, the Board did not abuse its discretion in upholding the 10-day suspension.

## DISPOSITION

The trial court's judgment denying petitioner's petition for writ of mandate is affirmed.  Defendants are awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


MOSK, J.


We concur:


TURNER, P. J.



BAKER, J.

19